**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MANH HO, derivatively on behalf of FIRST SOLAR, INC., | |
| Plaintiff, | Case No.: 1:26-cv-4555 |
| vs. | |
| MARK R. WIDMAR, ALEXANDER R. BRADLEY, MICHAEL J. AHEARN, ANITA MARANGOLY GEORGE, LISA A. KRO, WILLIAM J. POST, VENKATA RENDUCHINTALA, PAUL H. STEBBINS, MICHAEL T. SWEENEY, and NORMAN L. WRIGHT, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| FIRST SOLAR, INC., | |
| Nominal Defendant. | |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

Plaintiff Manh Ho ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant First Solar, Inc. ("First Solar" or the "Company"), files this Verified Shareholder Derivative Complaint against Mark R. Widmar ("Widmar"), Alexander R. Bradley ("Bradley"), Michael J. Ahearn ("Ahearn"), Anita Marangoly George ("George"), Lisa A. Kro ("Kro"), William J. Post ("Post"), Venkata Renduchintala ("Renduchintala"), Paul H. Stebbins ("Stebbins"), Michael T. Sweeney ("Sweeney"), and Norman L. Wright ("Wright") (collectively, the "Individual Defendants," and together with First Solar, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of First Solar, unjust enrichment, abuse of control,

1

gross mismanagement, waste of corporate assets, for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Widmar and Bradley for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding First Solar, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by First Solar's directors and officers from February 25, 2025 through February 24, 2026, both dates inclusive (the "Relevant Period").

2.      First Solar is a leading manufacturer of photovoltaic ("PV") solar energy solutions. The Company manufacturers its PV energy solutions all over the world, including Malaysia and Vietnam.

3.      On April 2, 2025, President Donald Trump announced a series of tariffs on U.S. imports from all countries, including rates of 24% and 46% on Malaysia and Vietnam, respectively. These tariffs were later reduced to 10%.

4.      Throughout the Relevant Period, the Individual Defendants either made or caused the Company to make false and misleading statements pertaining to the Company's long-term

market position and the strength of the Company's mitigation efforts to negative consequences of the tariffs. For example, on April 29, 2025, the Company held an earnings call to discuss its financial results for the first quarter of 2025 (the "1Q 2025 Earnings Call"). During the 1Q 2025 Earnings Call, Defendant Widmar touted the Company's long-term prospects in the face of the newly imposed tariffs. Specifically, Defendant Widmar stated, in relevant part:

> We continue to experience significant near term uncertainty from the budget reconciliation process and its potential impact on the Inflation Reduction Act, clean energy, tax credits, and now from the evolving trade landscape as the administration implements its new tariff initiatives. However, ***despite these near term challenges, we believe on balance, the political and trade environment continues to be an overall long term favorable from a First Solar perspective***. While the implementation of certain new trade policies was a possibility with the change in administration, the new tariff regime imposes — earlier this month has introduced significant challenges to 2025 that were not known at the start of the year.[1]

5.      On July 31, 2025, the Company held an earnings call to discuss its financial results for the second quarter of 2025 (the "2Q 2025 Earnings Call"). During the 2Q 2025 Earnings Call, Defendant Widmar continued to tout the strength of the Company's long-term prospects, even stating that the tariffs "strengthen[ed]" the Company's market position. Specifically, Defendant Widmar stated, in relevant part:

> As discussed during our previous earnings call, we are not immune from adverse effects related to trade policy. Later in the call, [Defendant Bradley] will address the impact of the global tariff measures on our international production capacity, considerations as well as on our bill of material costs.
>
> ***That said, notwithstanding these headwinds***, together with the uncertainty related to the executive order [concerning construction guidance as to relevant tax credits and FEOC guidance] mentioned earlier as well as the potential implications for the recent Department of Interior directive, ordering secretary's approval of many renewable project development activities, ***we believe that the recent policy and trade developments have, on balance, strengthen[ed] First Solar's relative position in the solar manufacturing industry.***

---

[1]Unless otherwise stated, all emphasis herein is added.

6.      The truth would not fully emerge until February 24, 2026, when the Company issued a press release reporting disappointing financial results for the fourth quarter and full-year 2025 and lower-than-expected 2026 revenue guidance (the "FY 2025 Earnings Release"). Specifically, the FY 2025 Earnings Release revealed 2026 revenue guidance of $4.2 billion to $5.2 billion, below consensus estimates of $6.16 billion.

7.      During an earnings call held the same day (the "FY 2025 Earnings Call"), Defendant Widmar detailed how the Company's strategy around the tariffs, such as underutilizing the Company's facilities in Malaysia and Vietnam, impacted the Company. Defendant Widmar stated, in relevant part:

> [*O*]*n the Southeast Asia, those factories are kind of running 20% or so. I mean they're extremely underutilized*. And what Alex said in his prepared remarks is that we're looking at this almost as option value. Now some of that capacity will be fully utilized once we get our South Carolina facility up because the front-end capacity for, call it, half of the Southeast Asia manufacturing will come to the U.S. So that will solve a piece of that underutilization. *The other half is going to continue to be underutilized at a very low utilization rate. But what we're looking at this is really an option to allow some of these potential tailwinds around 232 and other things to play itself out to see what the impact of that could be to create more demand for those international operations*. We also, I think, as we indicated in our last call, we are trying to work with a couple of counterparties on potentially meaningful volume offtake for those international production for that international production. But that's all still in the works. It's still going to be largely tethered back to what happens with the policy environment. *But we are incurring significant underutilization and cost headwinds because of what we're trying to do right now is figure out, let's create an option, let's evaluate what we continue to see in the market*. And we've been sort of wearing [sic] this for over a year now. One — it was about a year ago when these tariffs came in place, and we started to throttle down kind of towards the end of Q2, beginning of Q3, *and we've kind of run at a very low utilization rate to try to sort of buy some time to see how these tariffs ultimately get played ou*t.

8.      On this news, the price of the Company's stock fell $33.09 per share, or approximately 13.6%, from a closing price of $243.21 per share on February 24, 2026 to close at $210.12 per share on February 25, 2026.

4

9.      Throughout the Relevant Period, the Individual Defendants made materially false and misleading statements and failed to disclose material adverse facts about First Solar's business, operations, and prospects. In particular, the Individual Defendants failed to disclose to shareholders and investors, *inter alia*, that: (1) the impact the newly imposed tariffs would have on the Company was understated; and (2) the Company's mitigation efforts in response to the tariffs, such as opening a U.S. facility and underutilizing its facilities in Vietnam and Malaysia, were overstated. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

10.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

11.     In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by failing to maintain adequate internal controls while Defendants Stebbins and Sweeney engaged in improper insider sales, netting total proceeds of approximately $3.1 million.

12.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO") and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Eastern District of New York (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein— the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary

5

duty and other misconduct.

13.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendants Widmar's and Bradley's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

**JURISDICTION AND VENUE**

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

15.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District,

6

and Defendants' actions have had an effect in this District.

**PARTIES**

**Plaintiff**

18.      Plaintiff is a current shareholder of First Solar. Plaintiff has continuously held shares of First Solar common stock since first purchasing the stock on September 2, 2022.

**Nominal Defendant First Solar**

19.      First Solar is a Delaware corporation with principal executive offices at 4300 E Camelback Road, Suite 220, Phoenix, Arizona 85018. First Solar common stock trades on the NASDAQ Stock Market LLC ("NASDAQ") under the ticker symbol "FSLR."

**Defendant Widmar**

20.      Defendant Widmar has served as the Company's CEO and as a Company director since July 2016. Previously, Defendant Widmar served as the Company's CFO from April 2011 until June 2016, also serving as the Company's Chief Accounting Officer from February 2012 until June 2015.

21.      The Schedule 14A the Company filed with the SEC on April 30, 2026 (the "2026 Proxy Statement") stated the following about Defendant Widmar:

**Mark R. Widmar** was appointed Chief Executive Officer of First Solar in July 2016. He joined First Solar in April 2011 as Chief Financial Officer and also served as First Solar's Chief Accounting Officer from February 2012 through June 2015. From March 2015 to June 2016, Mr. Widmar served as the Chief Financial Officer and through June 2018, served as a director on the board of the general partner of 8point3 Energy Partners LP, the joint yieldco formed by First Solar and SunPower Corporation in 2015 to own and operate a portfolio of selected solar generation assets. Prior to joining First Solar, Mr. Widmar served as Chief Financial Officer of GrafTech International Ltd., a leading global manufacturer of advanced carbon and graphite materials, from May 2006 through March 2011. Prior to joining GrafTech, Mr. Widmar served as Corporate Controller of NCR Inc. from 2005 to 2006 and was a Business Unit Chief Financial Officer for NCR from November 2002 to his appointment as Controller. He also served as a Division Controller at Dell, Inc. from August 2000 to November 2002. Mr. Widmar also held various financial and managerial positions with Lucent Technologies Inc., Allied Signal,

7

Inc., and Bristol Myers/Squibb, Inc. He began his career in 1987 as an accountant with Ernst & Young. He holds a Bachelor of Science in business accounting and a Master of Business Administration from Indiana University. He serves as a member of the board of directors of Albemarle Corporation.

*Relevant Skills and Experience*

Mr. Widmar has significant public company experience, having served in a number of senior level executive positions. He has extensive knowledge of the solar energy sector, which is essential to his position as CEO of the Company and enables him to steer First Solar towards long-term strategic growth. He has demonstrated proven leadership and expertise throughout his tenure at First Solar, exhibiting a balanced approach and delivering superior results and value creation.

(Emphasis in original).

### Defendant Bradley

22.     Defendant Bradley has served as the Company's CFO since October 2016.

23.     The Company's leadership website stated the following about Defendant Bradley:[2]

Alexander R. Bradley was appointed Chief Financial Officer in October 2016. He joined First Solar in May 2008, and previously served as Vice President of both Treasury and Project Finance, leading or supporting the structuring, sale, and financing of over $10 billion and approximately 2.7 GW of the Company's worldwide development assets, including several of the largest PV power plant projects in North America. From June 2016 to June 2018, Mr. Bradley also served as an officer and board member of the general partner of 8point3. Prior to joining First Solar, Mr. Bradley worked at HSBC in investment banking and leveraged finance, in London and New York, covering the energy and utilities sector. He received his Master of Arts from the University of Edinburgh, Scotland.

### Defendant Ahearn

24.     Defendant Ahearn has served as the Company's non-executive Chairman since July 2012. He also serves as a member of the Technology Committee. Previously, he served as the Company's CEO from August 2000 until September 2009, interim CEO from October 2011 until May 2012, Executive Chairman from October 2009 until December 2010 and May 2012 to July

---

[2] https://www.firstsolar.com/en/About-Us/Leadership

2012, and as non-executive Chairman from January 2011 until October 2011.

25.     The 2026 Proxy Statement stated the following about Defendant Ahearn:

**Michael J. Ahearn**, *Chair of the Board, Technology Committee*. Mr. Ahearn previously served as the Company's chief executive officer from August 2000 to September 2009; interim chief executive officer from October 2011 to May 2012; executive chair from October 2009 to December 2010 and May 2012 to July 2012; and non-executive chair from January 2011 to October 2011 and July 2012 to present. Mr. Ahearn is currently Chair and Managing Partner of True North Venture Partners, L.P., a venture capital firm he launched in 2011 to invest primarily in early-stage companies in the energy, water, agriculture, and waste sectors. Prior to First Solar, he was partner and president of an equity investment firm, JWMA (formerly True North Partners, LLC). Prior to joining JWMA, Mr. Ahearn practiced law as a partner in the firm of Gallagher & Kennedy. Mr. Ahearn currently serves as a member of the board of directors of Cox Enterprises, Inc., and a member of the Global Advisory Board of Beijing Climate Policy Initiative. Mr. Ahearn holds a B.A. in Finance and a J.D. from Arizona State University. During his tenure as chief executive officer of First Solar, Mr. Ahearn led the development and expansion of First Solar from a small, privately held company to a successful multinational, industry-leading public company.

*Relevant Skills and Experience*

Mr. Ahearn's experience and insight are critical resources to the board of directors. His service as a former CEO of First Solar, including leading the transition of the Company from a start-up to one of the industry's major solar technology companies and global providers of PV solar energy solutions, provides him with essential institutional knowledge and vital insight into our organization, history, and industry. He possesses a deep financial knowledge and maintains expertise in strategic planning, capital formation and value creation.

(Emphasis in original).

### Defendant George

26.     Defendant George has served as a Company director since 2021. She also serves as a member of the Technology Committee.

27.     The 2026 Proxy Statement stated the following about Defendant George:

**Anita Marangoly George**, *Technology Committee*. Ms. George is a co-founder of a growth equity climate fund, Prosperete. Ms. George has held key leadership positions at la Caisse de Dépôt et Placement du Québec ("CDPQ"), a global investment group and Canada's second-largest pension fund manager, managing

9

funds for public retirement and insurance plans. Ms. George served CDPQ from 2016 to 2017 as Managing Director South Asia; from 2017 to 2020 as Executive Vice President and Head of Emerging Markets and Strategic Partnerships; and from 2020 until June 2021 as Executive Vice President, Deputy Head of CDPQ Global. Prior to joining CDPQ, Ms. George spent 22 years with the World Bank Group leading both public and private sector investments in sustainable infrastructure across various geographies. From June 2014 until 2016, she headed the global Energy, Oil and Gas, and Mining practice for the World Bank Group as Senior Director, Global Practice Energy and Extractives; and from 2000 to 2014, at the World Bank Group's International Finance Corporation ("IFC"). During her tenure at IFC, she served as Global Co-Director Infrastructure and Regional Director Asia Pacific, Infrastructure and Natural Resources. Ms. George is known for her expertise in infrastructure finance, especially renewable energy finance. She led global agreements addressing climate change during her tenure at the World Bank Group and has a distinguished track record in sustainable investments across the globe. In July 2022, Ms. George was appointed as an Independent Non-Executive Director on the Board of Tata Sons, the holding company of the Tata Group, where she currently serves on several committees, including Chair of the Audit Committee and Chair of the Group Risk Management Committee. Ms. George also serves on the boards of the Indo-Canadian Business Chamber, a not-for-profit promoting trade and investment relations between India and Canada where she served as President between 2020 to 2022, and TalentNomics India, a not-for-profit focused on empowerment of women. Formerly, she served on the World Economic Forum Global Future Council on Infrastructure for two terms, and currently serves on the following nonprofit advisory boards and councils: The Resilience Recovery Fund of the Self Employed Women's Association (SEWA), Women in Private Equity (an industry association for women in private equity), the Advisory Council of the Chandrakanta Kesavan Center for Energy Transition at the Indian Institute of Technology at Kanpur, the India Energy and Climate Center at the Goldman School of Public Policy, UC Berkeley (an affiliate of the Lawrence Berkeley National Laboratory), and the Financial Advisory Council of the International Solar Alliance (a multilateral institution that promotes solar world-wide). Ms. George holds a master's degree in Economic Policy and a Master of Business Administration from Boston University, and a Bachelor of Arts from Smith College. In recognition of her work in sustainability, Ms. George has been awarded Honorary Doctorate degrees (LLD) from Huron University and Concordia University, Canada.

Relevant Skills and Experience

Ms. George's experience working in climate finance and infrastructure across key global markets, combined with her experience and passion for human capital development and sustainability, are valuable resources to the board of directors and the Company. Through her expertise as a financial sector executive, she brings a command of credit, banking, and equity investments. She has also served in a number of international organizations, providing vital insight relevant for First Solar's expanding international operations, including as we commenced operations

of the Company's first manufacturing facility in India.

(Emphasis in original).

**Defendant Kro**

28.    Defendant Kro has served as a Company director since 2022. She also serves as the

Chair of the Audit Committee and as a member of the Nominating and Governance Committee.

29.    The 2026 Proxy Statement stated the following about Defendant Kro:

**Lisa A. Kro**, *Audit Committee (Chair), Nominating and Governance Committee*.
Ms. Kro has served as the Chief Financial & Administrative Officer of
Ryan Companies since 2019, overseeing their speculative industrial sector,
accounting, finance, human resources, legal, and information technology
departments. From 2011 to 2018, Ms. Kro was a founding partner of Mill City
Capital, L.P., a private equity firm, where she was Chief Financial Officer and
Managing Director. From September 2004 to March 2011, Ms. Kro was the Chief
Financial Officer and a Managing Director of Goldner Hawn Johnson & Morrison,
a private equity firm. She began her career in public accounting with a 17-year
tenure at KPMG, including spending a year at KPMG's Munich office and serving
as the Practice Leader for the Retail, Food & Manufacturing practice in the
Midwest. Ms. Kro is a director of MillerKnoll, Inc. (d/b/a Herman Miller, Inc.), a
publicly traded company. She has previously served on the board of eight private
companies, one public company, and five not-for-profit organizations. Ms. Kro is
a member of the National Association of Corporate Directors and the Minnesota
chapter of Women Corporate Directors. Ms. Kro has a Bachelor of Science degree
from Minnesota State University Moorhead and is a Certified Public Accountant
(retired).

*Relevant Skills and Experience*

Ms. Kro's accounting background, as well as her work in finance, public
accounting, capital markets, and public company audit committee experience
provides valuable oversight to the Company's financial accounting controls and
reporting and strategic planning and risk management. Her tenure on the boards of
both public and non-public companies, along with her executive-level roles,
enables Ms. Kro to offer insight into corporate governance practices and leadership.

(Emphasis in original).

**Defendant Post**

30.    Defendant Post has served as a Company director since 2010. He also serves as the

11

Company's Lead Independent Director and as a member of the Compensation Committee, Nominating and Governance Committee, and Technology Committee.

31.    The 2026 Proxy Statement stated the following about Defendant Post:

**William J. Post**, *Lead Independent Director, Compensation Committee, Nominating and Governance Committee, Technology Committee.* Mr. Post retired as chair and chief executive officer of Pinnacle West Capital Corporation ("Pinnacle West") in April 2009. He joined Arizona Public Service (the largest subsidiary of Pinnacle West) in 1973 and joined the boards of Arizona Public Service in 1995 and Pinnacle West in 1997. Mr. Post became chair of both boards in 2001 and retired in April 2010. He is currently on the board of directors of Blue Cross Blue Shield of Arizona and the Translational Genomics Research Institute. Mr. Post has served as chair of Swift Transportation, Stagg Information Systems, Nuclear Assurance Corporation, Nuclear Electric Insurance Limited, the Institute of Nuclear Power Operations, and El Dorado Investment Company. He also served as a director of Phelps Dodge Corporation and U.S. Airways. Mr. Post has a Bachelor of Science degree from Arizona State University.

*Relevant Skills and Experience*

Mr. Post brings to the board of directors executive-level utility-sector experience, including a deep understanding of the utility sector within the southwestern United States, a key market for the Company. He possesses considerable technical experience and expert knowledge on how to grow utility markets, provides critical insight into the viewpoints of the customers we seek to serve, and has deep ties within communities in which we have a presence. His tenure on public company boards, together with his CEO-level experience, allows Mr. Post to provide an in-depth corporate leadership perspective.

(Emphasis in original).

**Defendant Renduchintala**

32.    Defendant Renduchintala has served as a Company director since 2024. He also serves as the Chair of the Technology Committee and as a member of the Audit Committee.

33.    The 2026 Proxy Statement stated the following about Defendant Renduchintala:

**Venkata "Murthy" Renduchintala,** *Technology Committee (Chair), Audit Committee.* Dr. Renduchintala was chief engineering officer at Intel Corporation ("Intel") from November 2015 to August 2020. He also served as group president of Intel's Technology, Manufacturing, and Systems Architecture group. Prior to joining Intel in 2015, Dr. Renduchintala held various senior positions at Qualcomm

12

Incorporated, where he last served as executive vice president of Qualcomm Technologies ("Qualcomm") and as co-president of Qualcomm CDMA Technologies from 2012 to 2015. Dr. Renduchintala joined Qualcomm in 2004 from Skyworks Solutions, Inc. ("Skyworks"), where he was vice president and general manager of the Cellular Systems division from 2000 to 2004. Prior to Skyworks, he spent a decade with Philips Electronics, Inc., ("Philips Electronics") progressing to become vice president of engineering for its consumer communications business. Dr. Renduchintala has served as a member of the board of directors of Accenture plc since 2018. Dr. Renduchintala holds a Bachelor of Engineering in Electrical Engineering, a Master's degree in Business Administration and a Ph.D. in Digital Communication from the University of Bradford in England. He subsequently was awarded the honorary degree of Doctor of Technology by his alma mater for his contributions to science and technology and also appointed as an Honorary Visiting Professor.

*Relevant Skills and Experience*

Dr. Renduchintala brings to the board of directors global experience through his tenure as an executive at Intel and his other prior positions at Qualcomm, Skyworks, and Philips Electronics. Dr. Renduchintala also brings deep technology expertise that enables Dr. Renduchintala to offer insight into our technology and R&D roadmap. As chief engineering officer at Intel, he also gained expertise in strategic technology-related investments and, as a member of Intel's executive committee, oversaw the implementation of cybersecurity and risk management policy. His tenure on the board of Accenture plc and participation on both the audit and finance committees enables Dr. Renduchintala to help oversee our financial and accounting functions.

(Emphasis in original).

**Defendant Stebbins**

34.     Defendant Stebbins has served as a Company director since 2006. He also serves as the Chair of the Nominating and Governance Committee and as a member of the Audit Committee and the Compensation Committee.

35.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Stebbins made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share | Proceeds |
| --- | --- | --- | --- |

| November 7, 2025 | 1,423 | $261.27 | $371,787 |
| November 7, 2025 | 4,656 | $262.59 | $1,222,619 |
| November 7, 2025 | 921 | $263.19 | $242,398 |

Thus, in total, before the fraud was exposed, Defendant Stebbins sold 7,000 shares of Company stock on inside information, for which he received approximately $1,836,804 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

36.     The 2026 Proxy Statement stated the following about Defendant Stebbins:

**Paul H. Stebbins**, *Audit Committee, Compensation Committee, Nominating and Governance Committee (Chair).* Mr. Stebbins has served as chair emeritus and as a non-employee director of World Kinect Corporation ("World Kinect") since May 2014. Previously, Mr. Stebbins served as the chair and chief executive officer of World Kinect from July 2002 to January 2012 and as executive chair from January 2012 to May 2014. He has served as a director of World Kinect since June 1995. Between July 2000 and 2002, Mr. Stebbins also served as president and chief operating officer of World Kinect. In 1985, Mr. Stebbins co-founded Trans-Tec Services, a global marine fuel service company acquired by World Kinect in 1995. Mr. Stebbins is a founding member of the FixUSNow.org initiative on civic reform hosted by the Committee for a Responsible Federal Budget (CRFB.org). He is a member of the Advisory Council of Amigos International, a youth leadership development program based in Houston, Texas, a member of the Advisory Board of The Silk Road Project, Inc., a musical ensemble and cultural innovation organization founded by renowned cellist Yo-Yo Ma, and a member of the Council on Foreign Relations.

*Relevant Skills and Experience*

Mr. Stebbins brings to the board of directors significant CEO-level experience in managing a large global energy-related publicly traded company. His experience as an energy executive and wealth of knowledge regarding the energy industry provides him with insight about strategic, solution-oriented innovation and growth. He has significant, recent public policy expertise, which is beneficial given our Company's industry, and his insights into recent corporate governance and risk management developments provide critical perspective to the board of directors and the Company's management.

14

(Emphasis in original).

**Defendant Sweeney**

37.    Defendant Sweeney has served as a Company director since 2003. He also serves as the Chair of the Compensation Committee and as a member of the Nominating and Governance Committee.

38.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Sweeney made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/ Share | Proceeds |
|------|------------------|-------------------|----------|
| November 6, 2025 | 4,500 | $271.11 | $1,219,995 |

Thus, in total, before the fraud was exposed, Defendant Sweeney sold 4,500 shares of Company stock on inside information, for which he received approximately $1,219,995 in total proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

39.    The 2026 Proxy Statement stated the following about Defendant Sweeney:

**Michael T. Sweeney**, *Compensation Committee (Chair), Nominating and Governance Committee.* Mr. Sweeney served as President and Chief Executive Officer of Steinway Musical Instruments, Inc. from October 2011 until August 2016, director since April 2011, and chair of the board from July 2011 through September 2013. Mr. Sweeney served as chair of the board of Star Tribune Media Holdings, the holding company for the Minneapolis Star Tribune, from September 2009 to September 2014, and as a director of Carlson Companies, Inc. Mr. Sweeney served as managing partner in Goldner Hawn Johnson & Morrison, Inc., a private equity firm, from 2001 through 2008. He had previously served as president of Starbucks Coffee Company (UK) Ltd. in London and held various operating management and corporate finance roles.

*Relevant Skills and Experience*

Mr. Sweeney's background in investment banking and private equity, as well as his operational business acumen, are valuable resources to the board of directors and the Company, particularly with respect to consideration of compensation, financial matters, and strategic investments. His direct responsibility for business operations in a number of industries, including his service as a CEO, brings experience that is valuable to the board of directors, especially when it comes to corporate strategy and business development.

(Emphasis in original).

### Defendant Wright

40. Defendant Wright has served as a Company director since 2022. He also serves as a member of the Compensation Committee and the Nominating and Governance Committee.

41. The 2026 Proxy Statement stated the following about Defendant Wright:

**Norman L. Wright**, *Compensation Committee, Nominating and Governance Committee.* From May 2022 to August 2023, Mr. Wright served as Executive Vice President, Health Equity Strategy of UnitedHealth Group, where he had previously served as Executive Vice President & Chief Customer Officer. He previously served as Executive Vice President & Chief Marketing and Customer Officer and as Executive Vice President & Chief of Global Operations at Optum, a subsidiary of UnitedHealth Group. From 2007 to 2013, Mr. Wright was Managing Director, Client Experience for Citigroup Inc.'s Consumer Operations in North America and led the Retail Bank Call Centers. Prior to this, Mr. Wright served as an executive at a number of companies. He was Executive Partner, Customer Contact Transformation at Accenture plc. from 2004 to 2007, Senior Vice President, HSN Customer Care at HSN from 1999 to 2004, Senior Vice President and General Manager at Fidelity Investments Inc. from 1996 to 1999, Vice President, Customer Service at G.E. Capital from 1994 to 1996, and Vice President, Customer Service at JPMorganChase & Co. from 1986 to 1994. Mr. Wright currently serves on the boards of Option Care Health, the largest independent provider of infusion services in the U.S., and the YMCA of Arizona. He has previously served as a director of UnitedHealth Foundation and YMCA of the North, both non-profits, as well as The Brighton Center, Inc., the Tampa Bay Performing Arts Center, 1st Tee of San Antonio, and the University of Texas at San Antonio. Mr. Wright has a Bachelor of Arts from Swarthmore College.

*Relevant Skills and Experience*

Mr. Wright has nearly 40 years of experience as an executive in sales and customer service, contact centers, operations, marketing, consumer digital, and business consulting supporting a number of industries. He brings valuable leadership skills and business acumen to the board of directors. His skills and experience leading

large-scale equity and community engagement strategies and his training in domestic and international arenas to conceptualize and implement strategic plans, drive consumer focused outcomes, and maximize value for organizations are valuable to the Company's strategic planning efforts.

(Emphasis in original).

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

42.     By reason of their positions as officers, directors, and/or fiduciaries of First Solar and because of their ability to control the business and corporate affairs of First Solar, the Individual Defendants owed First Solar and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage First Solar in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Fist Solar and its shareholders so as to benefit all shareholders equally.

43.     Each director and officer of the Company owes to First Solar and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

44.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of First Solar, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

45.     To discharge their duties, the officers and directors of First Solar were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

46.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the

17

affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of First Solar, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised First Solar's Board at all relevant times.

47. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

48. To discharge their duties, the officers and directors of First Solar were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of First Solar were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Arizona, and the United States, and pursuant to First Solar's code of conduct titled *Relentless Integrity: How We Conduct Business Ethically* (the "Code of Conduct").

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how First Solar conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of First Solar and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that First Solar's operations would comply with all applicable laws and First Solar's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at

the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

49.     Each of the Individual Defendants further owed to First Solar and the shareholders the duty of loyalty requiring that each favor First Solar's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

50.     At all times relevant hereto, the Individual Defendants were the agents of each other and of First Solar and were at all times acting within the course and scope of such agency.

51.     Because of their advisory, executive, managerial, directorial, and controlling positions with First Solar, each of the Individual Defendants had access to adverse, non-public information about the Company.

52.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by First Solar.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

53.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

54.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants'

violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

55.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of First Solar was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

56.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

57.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of First Solar and was at all times acting within the course and scope of such agency.

## FIRST SOLAR'S CODE OF CONDUCT

58.     In the CEO's Message section of the Code of Conduct, it states:

We are in a highly dynamic and increasingly competitive marketplace. Our long-term success is built on our culture of adapting to changing conditions while differentiating ourselves from the competition with an unwavering commitment to operating at the highest ethical standards in all parts of our business, everywhere we do business.

Relentless Integrity: How We Conduct Business Ethically ("our Code") is an important resource designed to help us meet our business goals ethically. Our Code helps us navigate compliance risks and common issues we may face while conducting business for First Solar. While our Code covers many situations, it cannot address everything, so when the answer to an issue is not clear, we seek help.

Relentless integrity is expected of everyone, and our Code applies to everyone, from members of the Board of Directors to our Officers, Associates and our valued partners. We all have responsibilities regarding compliance and ethics, and chief among those is to speak up: we should all speak up, ask questions and report any concerns we have, using the resources our Code provides. First Solar does not tolerate retaliation against anyone who seeks help or reports concerns and will discipline those who engage in any retaliatory behavior.

Innovative and passionate people, working ethically and safely, are the foundation of our success. We must strive to make all decisions and take all actions in compliance with our policies and the law. When we operate in this way, we build trust with our associates, our customers and everyone with whom we do business. This trust becomes another point of differentiation and takes us further on our journey to lead the world's sustainable energy future.

59.    In a section titled "Our Commitment to Our Code," the Code of Conduct states, in

relevant part:

OUR RESPONSIBILITIES

The Code applies to everyone at First Solar, including all associates, officers and directors of the Company. We are all responsible for acting ethically and in compliance with all laws.

We follow our Code, our policies and the law, and we speak up,  ask questions and report any concerns we have.

Failure to comply with our Code, our policies and the law may result in discipline, including dismissal.

60.    In a section titled "Our Commitment to Ethical Business," the Code of Conduct

22

states, in relevant part:

AVOIDING CONFLICTS OF INTEREST

One way to demonstrate accountability for our actions is by never putting our private interests ahead of the interests of First Solar. Even circumstances that only appear to create a conflict of interest – that is, a conflict between our personal interests and the interests of the company – can damage First Solar's reputation and our own as individuals.

This is why we proactively disclose any potential conflicts of interest to Human Resources or to the Compliance Department as soon as they develop or become apparent.

61.    In the same section, under a subheading titled "Keeping Accurate Records," the Code of Conduct states, in relevant part:

We must keep accurate records for our business to be a success, to make informed business decisions and to meet our reporting obligations to our external stakeholders. Our business records can include but are not limited to financial reports, accounting records, timecards, business plans, environmental reports, accident reports and expense reports. Our records must accurately and completely reflect our business transactions, and we must enter them in a timely fashion.

We follow all policies and procedures, including those related to appropriate record storage and destruction, and we are responsible for learning to properly apply the procedures related to any books or records that we use or manage.

We never conceal, alter, damage or destroy any company record, and we follow instructions from the Legal Department to maintain and preserve records in the event of investigation or litigation.

If you have a record-keeping question, speak up and ask your manager or another resource listed in our Code.

62.    In the same section, under a subheading titled "Avoiding Insider Trading," the Code of Conduct states:

In our roles at the company, we may learn information that is not yet publicly known about First Solar, our customers, industry participants, partner companies, competitors or others.

Internal information about new products, upcoming business events such as mergers or sales and financial results, are some of just many examples of "insider

information" - material, non-public information – non-public, material information that a reasonable investor would consider when deciding whether to buy, hold or sell a company's stock. It violates the law and our policy to trade on such information, so we never buy or sell stock based on material, non-public we have learned at First Solar, nor do we provide, or "tip," such insider information to anyone else.

First Solar also has additional specific rules regarding directors, officers and associates trading in company securities. If you have questions about our Insider Trading Compliance Policy and how these rules might apply, you should speak up and contact Investor Relations or the Legal Department.

63. In the same section, under a subheading titled "Waiver," the Code of Conduct states: "Our Code cannot be waived unless a waiver is specifically granted by the Board of Directors."

64. In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## FIRST SOLAR'S AUDIT COMMITTEE CHARTER

65. The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). Under a section titled "Purpose of the Audit Committee," the Audit Committee Charter states:

> • assist the Board in monitoring (i) the integrity of the financial statements, (ii) the effectiveness of the system of internal controls of the Company, (iii) the qualifications, performance and independence of the independent auditor, (iv) the

performance of the Company's internal audit function, (v) the processes and procedures relating to risk assessment and risk management of financial and disclosure control-related, as well as reporting-related, matters and (vi) the Company's compliance with regulatory and legal requirements (including U.S. federal securities laws) regarding the preceding matters;

• prepare the report required by the rules of the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement;

• satisfy themselves that the Company's financial statements are complete, accurate and in accordance with U.S. generally accepted accounting principles ("GAAP") and fairly present the financial position and risks of the Company; and

• provide the Board with such information and materials as it may deem necessary to make the Board aware of significant financial matters that require the attention of the Board.

66.    Under a section titled "Responsibilities and Duties," under a subsection titled "General," the Audit Committee Charter describes the responsibilities of the Audit Committee in relevant part, as:

• Report regularly to the Board on the performance of the Committee's responsibilities and duties, as well as any issues that arise with respect to the quality or integrity of the Company's financial statements and internal controls, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditors or the performance of the internal audit function.

• Review and discuss with management and the independent auditors the Company's Form 10-Q report prior to its filing, and the results of the independent auditors' review of interim financial information. Such meeting shall include a review and discussion of the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations".

• Meet to review and discuss with management and the independent auditors the Company's Annual Report on Form 10-K prior to its filing, including the financial statements contained therein and the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations", and recommend to the Board whether the audited financial statements should be included in the Company's annual report on Form 10-K.

• Discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts, rating agencies or the investing public. Discussions of earnings press releases as well as financial information and earnings

guidance may be done generally (i.e., discussion of the types of information to be disclosed and the type of presentation to be made).

• Review and approve all reports and disclosure with respect to matters related to the Committee required to be included in the Company's proxy statement pursuant to applicable rules and regulations of the SEC.

• Review the Company's system of internal controls and discuss with management (including the senior internal audit executive) any material issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies.

• Discuss with management (including the senior internal audit executive) and the independent auditors the Company's processes and procedures relating to assessment and management of financial, disclosure and reporting risks, significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements.

\* \* \*

• Discuss with management and the independent auditor the effect on the Company's financial statements of any regulatory or accounting initiatives or any off-balance sheet structures.

• Review the disclosures and certifications of the Company's Chief Executive Officer and Chief Financial Officer under Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 as well as the Company's controls and processes surrounding such disclosures and certifications.

 • Review with management any use of non-GAAP financial measures disclosed in any of the Company's SEC filings, if applicable.

67.    In the same section, under a subheading titled "Legal Compliance," the Audit Committee Charter describes the responsibilities of the Audit Committee as:

• At least quarterly, review with Company counsel any legal matters that could have significant impact on the Company's financial statements or its compliance with applicable laws and regulations.

• Assist the Board in its oversight of the Company's compliance with legal and regulatory requirements.

68.    In the same section, under a subheading titled "Other Matters," the Audit Committee Charter describes the responsibilities of the Audit Committee in relevant part, as:

26

• Review and discuss with management the Company's major financial risk exposures as well as information security risks (including cybersecurity) and the steps management has taken to monitor, control and limit such exposures and risks, including the Company's risk assessment and risk management programs.

\* \* \*

• Monitor and review annually the Company's compliance with its Code of Business Conduct and Ethics.

\* \* \*

• Discuss with management any correspondence with regulators or governmental agencies or any published reports, in each case, which raise material issues regarding the Company's financial statements or accounting policies.

• Establish procedures for: (i) the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, and auditing matters; and (ii) the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

• Promote an environment that supports the integrity of the financial reporting process and the independence of the audit.

• Perform such other functions as may be necessary or appropriate under law, the Company's Charter or By-Laws or as directed by the Board.

69.    Defendants Kro (as Chair), Renduchintala, and Stebbins violated the Audit Committee Charter by engaging in or permitting the Company to issue materially false and misleading statements to the investing public and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing the oversight of risks related to financial reporting, internal controls, and internal information systems, failing to adequately discuss with management the Company's

financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### *Relevant Background*

70.     First Solar is one of the leading PV solar technology and manufacturing companies. The Company's PV products convert light into electricity using semiconducting materials.  The Company produces its products all over the globe, including the production of its Series 6 Modules in Malaysia and Vietnam.

71.     In April 2025, President Trump announced a series of tariffs on U.S. imports from countries that included Vietnam and Malaysia. President Trump originally put a rate of 24% on Malaysia and 26% on Vietnam but later reduced the tariffs to 10%. In response, the Company announced it would reduce its production of Series 6 modules in order to better account for circumstances, including an "uncertain U.S. policy environment following the 2024 U.S. elections," and "a supply and demand imbalance for Southeast Asian product."

### **False and Misleading Statements**

### *February 25, 2025 Earnings Call*

72.     The Relevant Period began on February 25, 2025, when the Company hosted an earnings call to discuss its financial results for the fourth quarter and full-year of 2024 (the "FY 2024 Earnings Call").

73.     During the FY 2024 Earnings Call, Defendant Widmar touted the demand for solar energy given the U.S. government's economic policy, stating, in relevant part:

> A word about the overall market conditions and our policy environment. Beginning with the macro-environment, President Trump has defined an expansive economic mandate that could reshape the US economy over the next four years, particularly in terms of electricity production and consumption. His administration's goals of accelerating economic growth, reducing inflation, establishing global energy

dominance, bringing American manufacturing jobs back and championing innovation, including artificial intelligence require abundant stable power generation.

Forecasts show that the US will need 128 gigawatts of new capacity by 2029 to meet high summer peak demand. And while President Trump is expected to preside over the first meaningful growth in electricity demand this century, it will not be without challenges, the most significant of which is the time it takes to expand power generation capacity and grid infrastructure. Considering the new natural gas capacity could take half a decade to come online and cost twice as much as it did five years ago, thanks to supply chain constraints, including the shortage of turbines. Large-scale nuclear power plants take more than a decade to permit, construct, and commission. While these decommissioned nuclear plants are an option, reportedly, only three assets can be economically recommissioned by 2028. And while hyped and anticipated to be quicker to deploy, small modular reactors are not expected to operate commercially at gigawatt scale before 2035. Quite simply, in order to avoid potential energy price related inflation, maintain its economic and innovation competitiveness, and secure its energy independence, the country cannot wait that long.

***Given its attributes of low cost and speed to deployment relative to other sources of energy generation, solar should clearly be a significant part of the near-term solution mix***. The administration and Congress must ensure that this unprecedented growth in power generation capacity is not deep in the country's dependence on China and that American manufacturers have access to a level playing field.

74.    In a discussion of the Company's 2025 guidance, Defendant Bradley discussed how the Company "oversold through 2026," allowing the Company to have revenue visibility during a time with volatile pricing conditions. Specifically, Defendant Bradley stated, in relevant part:

Excluding India, ***we remain cumulatively oversold through 2026***. As previously discussed, ***this oversold position is deliberate and in addition to providing us with revenue visibility in an industry that has historically experienced volatile pricing conditions provides us resilience to the uncertain timing of delivery inherent in some of our larger framework contracts***, the natural tendency for delay in the project development process as well as the potential for incremental supply as we start-up and ramp new factories. . . . [W]hilst beneficial in the longer term providing us with flexibility, the trade-off is that this over-allocation must be resolved in the near-term delivery window. . . .

***While we enter 2025 in a strong position with respect to our US production, we are in an under-allocation position for our Series 6 Malaysia and Vietnam production.*** This is driven in large part by two factors, one, customers employing module delivery shift rights, and the other, the previously mentioned contract

29

terminations that occurred in 2024. As it relates to module delivery shift rights, as previously mentioned, multiyear framework contracts typically have less certainty over specific delivery timing. . . . *[C]ustomers with intra-year flexibility are in many cases requesting deliveries in the second half of the year, which we expect will drive a back-end weighting of our full-year revenue and shipment results*.

75.     During the FY 2024 Earnings Call, Defendant Bradley assured investors that the Company's "sales contracts for product deliveries typically have some form of tariff protection," stating, in relevant part:

> [O]ur module sale contracts for international product deliveries typically have some form of tariff protection if new tariffs are imposed on the importation of modules into the US, whether in the form of First Solar termination right or tariff absorption that is either shared with the customer or exclusively borne by the customer customers.

### April 4, 2025 Proxy Statement

76.     On April 4, 2025, the Company filed a proxy statement on Schedule 14A with the SEC (the "2025 Proxy Statement").   Defendants Widmar, Ahearn, George, Kro, Post, Renduchintala, Stebbins, Sweeney, and Wright solicited the 2025 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

77.     The 2025 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Widmar, Ahearn, George, Kro, Post, Renduchintala, Stebbins, Sweeney, and Wright to the Board until the next annual meeting of the stockholders; (2) ratify the appointment of PriceWaterhouseCoopers LLP as the Company's independent registered public accounting firm for the year ending December 31, 2025; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers.

78.     Regarding "The Board's Role in Risk Oversight," the 2025 Proxy Statement stated, in relevant part:

> We have a comprehensive risk management process in which management is responsible for identifying and managing the Company's risks, and the board of

directors and its committees provide oversight in connection with these efforts. Risks are identified, assessed, and managed on an ongoing basis and communicated with management during periodic meetings or otherwise, as appropriate. Existing and potential material risks are addressed during periodic senior management meetings, resulting in both board and committee discussions. In addition, risk assessment is embedded in our business decision-making, business planning, budgeting, and strategic planning.

The board of directors is responsible for overseeing management in management's execution of its risk management responsibilities and for assessing the Company's approach to risk management. The board of directors administers this risk oversight function either through the full board or through one of its four standing committees, each of which examines various components of the Company's enterprise risks as part of its responsibilities. The full board reviews enterprise-wide strategic risks and certain other higher risk areas on a regular basis. An overall review of risk is inherent in the board's consideration of our long-term strategies and in the transactions and other matters presented to the board of directors, including capital expenditures, manufacturing capacity expansions, acquisitions, budgeting, and significant financial matters. A summary of the committee risk management responsibilities are as follows:

•Audit committee: Oversees financial risks (including risks associated with accounting, financial reporting, enterprise resource planning systems, and foreign currencies), legal and compliance risks, information security risks (including cybersecurity), and other risk management functions.

* * *

Management regularly reports on risk-related matters to the board of directors or the relevant committee thereof. Management presentations containing information regarding risks and risk management initiatives are given throughout the year in connection with quarterly and special board and committee meetings as well as other communications as needed or as requested by the board of directors or its committees. In addition, our internal audit team reports to the audit committee on a quarterly basis and has open access to the chair of the audit committee.

79.     Regarding the "Audit Committee," the 2025 Proxy Statement stated, in relevant part:

The audit committee oversees our financial reporting process on behalf of the board of directors and reports to the board of directors the results of these activities, including monitoring the effectiveness of the systems of internal controls established by management, the Company's audit and compliance process, and the Company's financial report filings. The audit committee, among other duties:

•engages the Company's independent registered public accounting firm;

•pre-approves all audit and non-audit services provided by the Company's independent registered public accounting firm;

•reviews with the Company's independent registered public accounting firm the plans and results of the audit engagement;

•considers whether any non-audit services provided by the Company's independent registered public accounting firm conflict with the independence of such independent registered public accounting firm;

•participates in the selection of the lead engagement partner of the Company's independent registered public accounting firm in conjunction with the mandatory rotation of the lead engagement partner;

•reviews the independence of the Company's independent registered public accounting firm;

•oversees the internal audit function, including the processes and procedures relating to risk assessment and risk management of financial, disclosure, and reporting related matters;

•regularly reviews and discusses with management any major financial risk exposures and the steps management has taken to monitor and control such exposures, including management's risk assessment and programs associated with internal control systems; and

•regularly (at least quarterly) reviews and discusses with management information security risks (including cybersecurity) and the steps management has taken to monitor and control such exposures, including (i) integration of the Company's cybersecurity controls and procedures, (ii) program prevention and remediation details, (iii) roadmaps of planned activities and improvements, (iv) internal training and awareness activities, and (v) material cyber incident response plans.

80.     Regarding the "Code of Conduct," the 2025 Proxy Statement stated, in relevant part:

We have adopted a code of conduct that applies to all directors and associates, including our chair, chief executive officer, chief financial officer, principal accounting officer, and other executive officers. These standards are designed to deter wrongdoing and to promote the honest and ethical conduct of all directors and associates. The code of conduct is posted on our website at www.firstsolar.com under "Investors – Governance." Any substantive amendment to, or waiver from,

any provision of the code of conduct with respect to any director or executive officer will be posted on our website.

81. The 2025 Proxy Statement was materially false and misleading because it failed to disclose, *inter alia*, that: (1) the impact the newly imposed tariffs would have on the Company was understated; and (2) the Company's mitigation efforts in response to the tariffs, such as opening a U.S. facility and underutilizing its facilities in Vietnam and Malaysia, were overstated. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

82. The 2025 Proxy Statement also failed to disclose, inter alia, that: (1) although the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

83. As a result of Defendants Widmar, Ahearn, George, Kro, Post, Renduchintala, Stebbins, Sweeney, Widmar, and Wright causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, inter alia, to: (1) re-elect Defendants Widmar, Ahearn, George, Kro, Post, Renduchintala, Stebbins, Sweeney, and Wright to the Board for a one-year term, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of PriceWaterhouseCoopers LLP as the Company's independent registered public accounting firm for the year ending December 31, 2025; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers.

***April 29, 2025 Earnings Call***

84. On April 29, 2025, the Company hosted the 1Q 2025 Earnings Call.

85.     During the 1Q 2025 Earnings Call, Defendant Widmar continued to highlight the Company's "long term favorable" position despite near term challenges in "recent policy and trade developments." Specifically, Defendant Widmar stated, in relevant part:

We continue to experience significant near term uncertainty from the budget reconciliation process and its potential impact on the Inflation Reduction Act, clean energy, tax credits, and now from the evolving trade landscape as the administration implements its new tariff initiatives. However, ***despite these near term challenges, we believe on balance, the political and trade environment continues to be an overall long term favorable from a First Solar perspective***. While the implementation of certain new trade policies was a possibility with the change in administration, the new tariff regime imposes — earlier this month has introduced significant challenges to 2025 that were not known at the start of the year.

86.     Later in the 1Q 2025 Earnings Call, Defendant Widmar also discussed how the Company "may not be in a position to utilize our currently available international production capacity" due to "increased tariff exposure", stating, in relevant part:

[O]ur ability to optimize our U.S. production with our international production to support our customers' qualifications of the domestic content ITC bonus may be constrained under the new tariff regime. As we may not be in a position to utilize our currently available international production capacity, absent customers' willingness to absorb or meaningfully share the increased tariff exposure. Our customers' willingness to bear some or all of the tariff costs beyond this module contracted obligation must be considered in the contents of the overall project-related cost increases from the new tariffs, including not just with respect to the modules but also tracker, inverters, transformers, and other imported equipment.

87.     Additionally, Defendant Widmar touted the Company's long-term prospects and tariff mitigation strategies such as reduced or idled production at the Company's facilities in Malyasia and Vietnam. Specifically, Defendant Widmar stated, in relevant part:

Given the majority of the best components with some dependency on Chinese supply chain, Solar Plus storage projects in particular may face significantly increased costs. ***Given these headwinds, we expect to pivot our India facility away from exports to the U.S.*** and towards producing more product for the domestic India market. ***With regards to the impact of new tariffs on our Malaysia and Vietnam factories, we will continue to evaluate best options to optimize production across the sites in a potentially reduced U.S. demand environment for non-domestic product, but are mindful that we may need to further reduce or idle***

34

*production at one or both of these location*s, especially if the announced reciprocal tariffs are put in place. *That said, despite these near-term challenges presented by the new tariff regime, we believe the long-term outlook for solar demand, particularly in our core U.S. market remains strong, and the First Solar remains well positioned to serve this demand.*

88.     Defendant Widmar further boasted the Company's "long term prospects" despite "unanticipated near term challenges" when discussing how the First Solar's future domestic expansion would not be encumbered by "the prospects of [foreign entity of concern legislation]." Defendant Widmar stated, in relevant part:

[G]iven First Solar's profile as a U.S. company, any future domestic capacity expansion would be unencumbered by the prospects of FEOC legislation, a concept based on discussions in Washington DC and elsewhere has been favorably received by certain members of the administration and Congress, and we believe must be factored into capital commitment decisions by the large majority of our prospective domestic competitors. . . .

*In summary, while we are facing unanticipated near term challenges following the imposition of the April tariff regime, we remain confident in the long term prospects for First Solar in terms of the U.S. solar energy demand and First Solar's ability to leverage its unique profile and competitive differentiation to serve this demand*. Through this confidence, we must be tethered to the continued enforcement and strengthening of the U.S. trade laws and supportive of industrial policy given the irrational and illegal Chinese trade practices. This confidence is based on our profile as America's largest and most established domestic solar module manufacturer. It's only fully vertically integrated producer. Our significant network of domestic supply chain vendors, our proprietary Cad-Tel-based semiconductor that is not beholden to the Chinese crystal and silicon industry, and our ability to enable prospects — aspects of the administration's platform of reshoring American manufacturing and supporting the powering of the next generation of critical industries.

89.     Later in the 1Q 2025 Earnings Call, Defendant Bradley updated investors on the Company's financial guidance and how the guidance was formulated with a "reduction in capacity utilization and throughput at our Malaysia and Vietnam factories beginning in Q2." Defendant Bradley stated, in relevant part:

*We've elected to update our financial guidance with ranges based on expected impacts from the new tariff regime*. For the upper end of our range, we assume the

impacts from the tariff policy in place as of today's call remaining through at least the end of 2025. . . . The lower end of our range assumes the above with the addition of including the impacts from the assumption that reciprocal tariffs take effect as of July 9, namely 26%, 24%, and 46% applicable to India, Malaysia, and Vietnam respectively. . . .

Given the tariff-related uncertainty associated with solar project's overall CapEx and the challenges of booking new volume in the current unsettled policy climate, our updated guidance removes this volume from both the high and low end of the range. ***In addition, both the high and low end of our guidance ranges see a reduction in capacity utilization and throughput at our Malaysia and Vietnam factories beginning in Q2 to align with anticipated reduced demand for these potentially highly tariffed modules***.

***Temporary idling of production***, despite the near term underutilization cost impact, approximately 40% of which is non-cash***, provides us with optionality as we await further updates to the tariff regime as it relates to Malaysia and Vietnam***, as well as the outcome of the budget reconciliation process and any impact to the IRA. . . .

90.    During the question-and-answer session of the 1Q 2025 Earnings Call, Defendant Widmar discussed how the Company chose to idle the Malaysian and Vietnamese facilities for just the second half of the year because some of the Company's customers could absorb some of the costs with the reciprocal tariffs. Defendant Widmar stated, in relevant part:

[O]ur guide is very much reflective of realization of tariffs are real, and they have consequences, right? . . . . [W]hen you look at the impact of those rates using Vietnam as an example, of 46%. It becomes uneconomical to ship a product with a 46% tariff into the U.S. and be able to sell that to an end customer, and our contracts with our customers are structured in such a way that the vast majority of them, there is a tariff provision in there, which is largely to protect us from a downside standpoint, right? . . . [S]o we have to negotiate once the impact of the tariffs have been determined. . . . ***Now, we could get to a better outcome with our customers.*** We could also see a better outcome with revised rates on those country-specific rates, don't know. ***That's also why we've chosen to just idle the facilities in the second half of the year to understand what happens with potential change to the current country-specific rates ….***

***July 31, 2025 Earnings Call***

91.    On July 31, 2025, the Company hosted the 2Q 2025 Earnings Call. During the 2Q 2025 Earnings Call, Defendant Widmar stated that the U.S. government's recent tariff policy

36

actually strengthened First Solar's position in the industry. Specifically, Defendant Widmar stated, in relevant part:

> As discussed during our previous earnings call, we are not immune from adverse effects related to trade policy. Later in the call, [Defendant Bradley] will address the impact of the global tariff measures on our international production capacity, considerations as well as on our bill of material costs.
>
> ***That said, notwithstanding these headwinds***, together with the uncertainty related to the executive order [concerning construction guidance as to relevant tax credits and FEOC guidance] mentioned earlier as well as the potential implications for the recent Department of Interior directive, ordering secretary's approval of many renewable project development activities, ***we believe that the recent policy and trade developments have, on balance, strengthen[ed] First Solar's relative position in the solar manufacturing industry.***

92.     Additionally, Defendant Bradley provided investors with increased guidance for 2025, which reflected a "plan to address the resulting supply-demand imbalance through additional curtailments," including the "potential temporary idling of production." Specifically, Defendant Bradley stated, in relevant part:

> Our revised guidance incorporates the anticipated implementation of recently negotiated tariffs of 25% to Malaysia and 20% for Vietnam. . . . ***In the event of customer terminations resulting from an inability or unwillingness to absorb tariff impacts on our international product, we plan to address the resulting supply-demand imbalance through additional curtailments, including the potential temporary idling of production***. As such, the lower end of our guidance range reflects increased underutilization period costs and the associated loss margin tied to these volume assumptions. . . .

93.     During the question-and-answer session of the 2Q 2025 Earnings Call, Defendant Widmar discussed the benefits of idling First Solar's facilities in Malaysia and Vietnam, such as taking advantage of U.S. tax credits, stating, in relevant part:

> ***The nice thing about running Malaysia and Vietnam at lower capacity right now means there's excess tools that are available.*** That means we can go after those tools if the decision is that, as the rates have come with the announcement of the tariff rates, it really is going to be uneconomic with the continued import from those markets. ***It's going to be more beneficial for us to bring in semi-finished product, do that here in the U.S., take advantage of the manufacturing tax credit***

*environment.*

*October 30, 2025 Earnings Call*

94.    On October 30, 2025, the Company held an earnings call to discuss its financial results for the third quarter of 2025 (the "3Q 2025 Earnings Call").

95.    During the 3Q 2025 Earnings Call, Defendant Widmar stated that the Company had "reduced production in Malaysia and Vietnam" and stated this was driven by lower demand caused by a customer's default on certain multiyear agreements. Specifically, Defendant Widmar stated, in relevant part:

> We terminated 6.6 gigawatts of bookings under multiyear agreements defaulted on by affiliates of BP, a European oil and gas major, at a base ASP of $0.294 per watt. . . . ***In Q3, we reduced production in Malaysia and Vietnam, primarily due to lower demand driven by the customer default previously mentioned***.

96.    Also, during the 3Q 2025 Earnings Call, Defendant Widmar announced that the Company was establishing a new production facility in the U.S. which would "improve the gross margin profile of our sales by reducing tariff charges." Defendant Widmar stated, in relevant part:

> We have made the decision to establish a new production facility in the United States, allowing us to onshore the finishing of Series 6 modules initiated by the company's international factories. While the location is subject to final negotiations, we have -- with an announcement expected in the coming weeks, the planned capacity will be 3.7 gigawatts. Production will start at the end of '26 and ramp through the first half of 2027. As we previously noted, such an investment is expected to enable additional production in the U.S. market that we expect will be fully compliant with forthcoming FEOC guidance as well as improve the gross margin profile of our sales by reducing tariff charges and logistics costs associated with importing finished goods.

97.    Later in the 3Q 2025 Earnings Call, Defendant Bradley discussed how the new U.S. production facility was a major factor in the Company's revised guidance, stating in relevant part:

> ***Three significant updates drive our revised guidance ranges today. Firstly, the decision announced today to establish a new 3.7 gigawatts U.S. production facility***, enabling us to onshore finishing for Series 6 modules initiated by our international fleet will result in approximately $330 million of total program direct

38

spend, including approximately $260 million of capital expenditures and approximately $70 million of non-capitalized expense associated with equipment deinstallation, cleaning, packaging, shipping, import tariffs and reinstallation.

Of this, we expect an incremental $26 million of CapEx and $2 million of production start-up expense in 2025. In addition, we forecast approximately $10 million of incremental indirect charges in 2025 associated with this decision, including severance and asset impairment expenses. *As previously noted, we continue to evaluate options for our remaining Malaysia and Vietnam facilities*. Today's guidance excludes any additional costs associated with potential restructuring charges or asset impairments that may impact 2025 or future operating results.

98.    During the question-and-answer session of the Q3 2025 Earnings Call, Defendant Widmar was asked "what conclusion we can draw about the underabsorption of Malaysia and Vietnam next year," to which Defendant Widmar responded by stating that the Company was in negotiations with customers to take some volume from the facilities. Specifically, Defendant Widmar stated, in relevant part:

[A]s it relates to the balance of that production, one of the things we're continuing to work through *and we are in negotiations with a couple of counterparties to almost do a bilateral for that offtake of that volume* and to structure a deal around that [indiscernible] we can get to terms. *We'd like to find potentially a couple of large customers with large offtake requirements that we can then sort of just sole source that into those opportunities*. I think we said in our prepared remarks, we have something like 6 gigawatts of contracted backlog or something like that for Series 6 international still. So we've got some runway in terms of volume and absorption for those production assets, and then we'll continue to evaluate them as we learn more about some of these policy decisions that will be made.

***November 14, 2025 Press Release***

99.    On November 14, 2025, the Company issued a press release titled "First Solar Selects South Carolina for New US Production Facility" (the "November 2025 U.S. Facility Press Release").

100.    The November 2025 U.S. Facility Press Release stated the new U.S. facility would "onshore final production processes for Series 6 *Plus* modules initiated by the Company's

international fleet." The November 2025 U.S. Facility Press Release also stated that the facility "[was] scheduled to commence commercial operations in the second half of 2026", and quoted Defendant Widmar as stating, in relevant part:

> "The passage of the One Big Beautiful Bill Act and the Administration's trade policies boosted demand for American energy technology, requiring a timely, agile response that allows us to meet the moment," said Mark Widmar, chief executive officer, First Solar. "We expect that this new facility will enable us to serve the US market with technology that is compliant with the Act's stringent provisions, within timelines that align with our customers' objectives."

101.    The above statements in ¶¶ 72-75, 84-100 were materially false and misleading and failed to disclose, *inter alia*, that: (1) the impact the newly imposed tariffs would have on the Company was understated; and (2) the Company's mitigation efforts in response to the tariffs, such as opening a U.S. facility and underutilizing its facilities in Vietnam and Malaysia, were overstated. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Begins to Emerge As the False and Misleading Statements Continue

### *January 7, 2026 Jeffries Report*

102.    The truth began to emerge on January 7, 2026, when Jeffries downgraded First Solar from Buy to Hold, citing that throughout 2025 the Company had lowered guidance, faced significant de-bookings and experienced margin compression. Jeffries also stated that "[international] facilities remain a pain point while tariffs exist" and "underutilization at [international] facilities remains a concern." Jeffries also stated that the Company's deployment opportunities were likely to be more limited in 2026.

103.    On this news, the price of the Company's stock fell $27.67 per share, or approximately 10.3%, from a closing price of $266.78 per share on January 6, 2026 to close at $241.10 per share on January 7, 2026. However, the Individual Defendants continued to obfuscate

40

the truth surrounding the strength of the Company's tariff mitigation strategy.

*February 23, 2026 Press Release*

104.    For example, on February 23, 2026, the Company issued a press release titled "First Solar Projected to Support Nearly 40,000 American Jobs, Contribute $7.8 Billion to US GDP Annually by 2027" (the "February 2026 U.S. Facility Press Release").

105.    The February 2026 U.S. Facility Press Release detailed the results of an impact study conducted by the Company which stated that the new U.S. production facility was projected to increase the number of its supported jobs "by almost 10,000 from 2025 to 2027" and an increased estimated contribution to U.S. gross domestic product, "from $5.8 billion in 2025 to $7.8 billion in 2027."

106.    The February 2026 U.S. Facility Press Release quoted Defendant Widmar as touting how the study showed that the new facility enabled the Company to "deliver long-term economic value." Specifically, Defendant Widmar was quoted as stating:

> "This study demonstrates how genuinely American solar manufacturing can deliver long-term economic value at the intersection of national priorities such as energy dominance, affordable electricity, and economic prosperity,' said Mark Widmar, chief executive officer, First Solar."

107.    The above statements in ¶¶ 104-106 were materially false and misleading and failed to disclose, *inter alia*, that: (1) the impact the newly imposed tariffs would have on the Company was understated; and (2) the Company's mitigation efforts in response to the tariffs, such as opening a U.S. facility and underutilizing its facilities in Vietnam and Malaysia, were overstated. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Fully Emerges**

108.    The truth fully emerged on February 24, 2026, when the Company issued the FY

41

2025 Earnings Release reporting disappointing financial results for the fourth quarter and full-year 2025 and lower-than-expected 2026 revenue guidance. Specifically, the FY 2025 Earnings Release revealed 2026 revenue guidance of $4.2 billion to $5.2 billion, below consensus estimates of $6.16 billion.

109.    The same day, the Company held the FY 2025 Earnings Call. On the FY 2025 Earnings Call, Defendant Bradley elaborated on the Company's 2026 guidance, stating, in relevant part:

> I'll now cover the full year 2026 guidance ranges . . . Our net sales guidance [is] between $4.9 billion and $5.2 billion. Gross margin is expected to be between $2.5 billion and $2.6 billion or approximately 49.5%, which includes $2.1 billion to $2.19 billion of Section 45X tax credits and $115 million to $155 million of ramp and underutilization costs.

110.    Defendant Bradley detailed how the Company's low utilization of its facilities in Malaysia and Vietnam impacted the Company. Specifically, Defendant Bradley stated, in relevant part:

> Before turning to our financial guidance, I want to briefly reiterate our approach to managing the business amid a dynamic market policy and trade environment. . . . We entered 2026 with a fully allocated position for our U.S. production. Given tariff uncertainty, our India production is assumed to be sold into the India domestic market. We'll continue to monitor opportunities to export products into the U.S. where it is margin accretive to do so. Our guidance assumes our India facility operating at full capacity with the ability to flex production as needed through the year in response to changes in demand signals. Demand for our Series 6 international products produced in Malaysia and Vietnam remains constrained. Our decision in Q4 of 2025 to establish a new finishing line in the U.S. allows us to make use of a portion of the front end of these Southeast Asian facilities, optimizing freight, tariffs and domestic content for the sale of incremental products into the U.S. domestic market. We intend to run our remaining end-to-end capacity in Malaysia and Vietnam at low utilization rates this year despite the financial impact of doing so, maintaining a near-term option to increase throughput should catalysts such as the political and regulatory matters discussed earlier, drive incremental profitable demand.

111.    During the question-and-answer session of the FY 2025 Earnings Call, Defendant

42

Bradley elaborated on the impact of the Company's strategy to underutilize its facilities in Malaysia and Vietnam, describing it as a way to "buy some time to see how these tariffs ultimately get played out." Specifically, Defendant Bradley stated, in relevant part:

*[O]n the Southeast Asia, those factories are kind of running 20% or so. I mean they're extremely underutilized*. And what Alex said in his prepared remarks is that we're looking at this almost as option value. Now some of that capacity will be fully utilized once we get our South Carolina facility up because the front-end capacity for, call it, half of the Southeast Asia manufacturing will come to the U.S. So that will solve a piece of that underutilization. *The other half is going to continue to be underutilized at a very low utilization rate. But what we're looking at this is really an option to allow some of these potential tailwinds around 232 and other things to play itself out to see what the impact of that could be to create more demand for those international operations*. We also, I think, as we indicated in our last call, we are trying to work with a couple of counterparties on potentially meaningful volume offtake for those international production for that international production. But that's all still in the works. It's still going to be largely tethered back to what happens with the policy environment. *But we are incurring significant underutilization and cost headwinds because of what we're trying to do right now is figure out, let's create an option, let's evaluate what we continue to see in the market*. And we've been sort of wearing [sic] this for over a year now. One — it was about a year ago when these tariffs came in place, and we started to throttle down kind of towards the end of Q2, beginning of Q3, *and we've kind of run at a very low utilization rate to try to sort of buy some time to see how these tariffs ultimately get played out.*

112.   On this news, the price of the Company's stock fell $33.09 per share, or approximately 13.6%, from a closing price of $243.21 per share on February 24, 2026 to close at $210.12 per share on February 25, 2026.

## DAMAGES TO FIRST SOLAR

113.   As a direct and proximate result of the Individual Defendants' conduct, First Solar will lose and expend many millions of dollars.

114.   Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

115.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

116.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

117.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company, including lucrative insider trading conducted by one of the Individual Defendants.

118.    As a direct and proximate result of the Individual Defendants' conduct, First Solar has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

119.    Plaintiff brings this action derivatively and for the benefit of First Solar to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of First Solar, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act.

120.    First Solar is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

44

121.   Plaintiff is, and has been at all relevant times, a shareholder of First Solar. Plaintiff will adequately and fairly represent the interests of First Solar in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

122.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

123.   A pre-suit demand on the Board of First Solaris futile and, therefore, excused.  At the time of filing of this complaint, the Board consists of the following ten individuals: Defendants Widmar, Ahearn, George, Kro, Post, Renduchintala, Stebbins, Sweeney, and Wright (the "Director Defendants") and non-party Curtis A. Morgan (collectively with the Director Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the ten Directors that were on the Board at the time of the filing of this complaint.

124.   Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, all of which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

125.   In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly caused or permitted First Solar to issue materially false and misleading statements. Specifically, the Director Defendants caused First Solar to issue false and misleading statements which were intended to make First Solar appear more profitable and attractive to

investors. Moreover, the Director Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

126. Additional reasons that demand on Defendant Widmar is futile follow. Defendant Widmar has served as a Company director and as the Company's CEO since July 2016. Previously, Defendant Widmar served as the Company's CFO from April 2011 until June 2016 as well aas the Company's Chief Accounting Officer from February 2012 until June 2015. The Company provides Defendant Widmar with his primary occupation, for which he received handsome compensation. Thus, as the Company admits, he is not an independent director. As the Company's highest officer and a trusted Company director, he conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Moreover, Defendant Widmar solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and the Director Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to First Solar. Further, Defendant Widmar is a defendant in the Securities Class Action. For these reasons, Defendant Widmar breached his fiduciary duties, faces a substantial likelihood of liability, is not independent nor disinterested, and thus demand upon him is futile and, therefore, excused.

127. Additional reasons that demand on Defendant Ahearn is futile follow. Defendant

46

Ahearn has served as a Company director since 2000 and also serves as a member of the Technology Committee. Defendant Ahearn has also served as the Company's non-executive Chairman since 2012. Defendant Ahearn previously served as the Company's CEO. Further, the Company admits that Defendant Ahearn is not an independent director. Defendant Ahearn has received and continues to receive handsome compensation for his role as a director. As a trusted, long-time Company director, he conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Ahearn solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and the Director Defendants the Board, thereby allowing them to continue breaching their fiduciary duties to First Solar. For these reasons, Defendant Ahearn breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

128. Additional reasons that demand on Defendant George is futile follow. Defendant George has served as a Company director since 2021. She also serves as a member of the Technology Committee. Defendant George has received and continues to receive handsome compensation for her role as a director. As a trusted, long-time Company director, she conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Moreover, Defendant George solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of herself and the Director

Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to First Solar. For these reasons, Defendant George breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

129. Additional reasons that demand on Defendant Kro is futile follow. Defendant Kro has served as a Company director since 2022. Defendant Kro also serves as the Chair of the Audit Committee and as a member of the Nominating and Governance Committee. Defendant Kro has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Moreover, Defendant Kro solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of herself and the Director Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to First Solar. For these reasons, Defendant Kro breached her fiduciary duties, faces a substantial likelihood of liability, is not independent nor disinterested, and thus demand upon her is futile and, therefore, excused.

130. Additional reasons that demand on Defendant Post is futile follow. Defendant Post has served as a Company director since 2010. Defendant Post also serves as the Company's Lead Independent Director and as a member of the Compensation Committee, Nominating and Governance Committee, and Technology Committee. Defendant Post has received and continues to receive handsome compensation for his role as a director. As a trusted, long-time Company director, he conducted little, if any oversight of the scheme to cause the Company to make false

48

and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Post solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and the Director Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to First Solar. For these reasons, Defendant Post breached his fiduciary duties, faces a substantial likelihood of liability, is not independent nor disinterested, and thus demand upon him is futile and, therefore, excused.

131. Additional reasons that demand on Defendant Renduchintala is futile follow. Defendant Renduchintala has served as a Company director since 2024. Defendant Renduchintala also serves as the Chair of the Technology Committee and as a member of the Audit Committee. Defendant Renduchintala has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Renduchintala solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and the Director Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to First Solar. For these reasons, Defendant Renduchintala breached his fiduciary duties, faces a substantial likelihood of liability, is not independent nor disinterested, and thus demand upon him is futile and, therefore, excused.

132. Additional reasons that demand on Defendant Stebbins is futile follow. Defendant Stebbins has served as a Company director since 2006. Defendant Stebbins also serves as the Chair

of the Nominating and Governance Committee and as a member of the Audit Committee and Compensation Committee. Defendant Stebbins has received and continues to receive handsome compensation for his role as a director. As a trusted, long-time Company director, he conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Stebbins solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and the Director Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to First Solar. Further, Defendant Stebbins's insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements herein, further demonstrate his motive in facilitating and participating in the scheme. For these reasons, Defendant Stebbins breached his fiduciary duties, faces a substantial likelihood of liability, is not independent nor disinterested, and thus demand upon him is futile and, therefore, excused.

133. Additional reasons that demand on Defendant Sweeney is futile follow. Defendant Sweeney has served as a Company director since 2003. Defendant Sweeney also serves as the Chair of the Compensation Committee and as a member of the Nominating and Governance Committee. As a trusted, long-time Company director, he conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Sweeney solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and the Director Defendants to the Board, thereby allowing them to continue

breaching their fiduciary duties to First Solar. Further, Defendant Sweeney's insider sale while the Company's stock price was artificially inflated as a result of the false and misleading statements herein, further demonstrate his motive in facilitating and participating in the scheme. For these reasons, Defendant Sweeney breached his fiduciary duties, faces a substantial likelihood of liability, is not independent nor disinterested, and thus demand upon him is futile and, therefore, excused.

134.    Additional reasons that demand on Defendant Wright is futile follow. Defendant Wright has served as a Company director since 2022. He also serves as a member of the Compensation Committee and the Nominating and Governance Committee. As a trusted Company director, he conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Wright solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and the Director Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to First Solar. For these reasons, Defendant Wright breached his fiduciary duties, faces a substantial likelihood of liability, is not independent nor disinterested, and thus demand upon him is futile and, therefore, excused.

135.    Additional reasons that demand on the Board is futile follow.

136.    Defendants Kro (as Chair), Renduchintala, and Stebbins (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable

laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

137.   In violation of the Code of Conduct, the Director Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity; failing to avoid conflicts of interest; failing to ensure the Company's disclosures were accurate; failing to ensure the Company complied with applicable laws, rules, and regulations; and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

138.   First Solar has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for First Solar any part of the damages First Solar suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

139.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

140.    The acts complained of herein constitute violations of fiduciary duties owed by First Solar's officers and directors, and these acts are incapable of ratification.

141.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of First Solar. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of First Solar, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

142. If there is no directors' and officers' liability insurance, then the Director Defendants will not cause First Solar to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

143. Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
**Against Defendants Widmar, Ahearn, George, Kro, Post, Renduchintala, Stebbins, Sweeney, and Wright for Violations of Section 14(a) of the Exchange Act**

144. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

145. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

146. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

147.    Under the direction and watch of Defendants Widmar, Ahearn, George, Kro, Post, Renduchintala, Stebbins, Sweeney, and Wright, the 2025 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

148.    The 2025 Proxy Statement was also materially misleading because it failed to disclose that: (1) the impact the newly imposed tariffs would have on the Company was understated; and (2) the Company's mitigation efforts in response to the tariffs, such as opening a U.S. facility and underutilizing its facilities in Vietnam and Malaysia, were overstated. As a result of the foregoing, Defendants Widmar, Ahearn, George, Kro, Post, Renduchintala, Stebbins, Sweeney, and Wright caused the Company's public statements to be materially false and misleading at all relevant times.

149.    Defendants Widmar, Ahearn, George, Kro, Post, Renduchintala, Stebbins, Sweeney, and Wright knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the 2025 Proxy Statement, including but not limited to, the re-election of directors.

150.    The false and misleading elements of the 2025 Proxy Statement led Company shareholders voted to, *inter alia*: (1) re-elect Defendants Widmar, Ahearn, George, Kro, Post, Renduchintala, Stebbins, Sweeney, and Wright to the Board for a one-year term, thereby allowing

them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of PriceWaterhouseCoopers LLP as the Company's independent registered public accounting firm for the year ending December 31, 2025; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers.

151. The Company was damaged as a result of Widmar's, Ahearn's, George's, Kro's, Post's, Renduchintala's, Stebbins's, Sweeney's, and Wright's material misrepresentations and omissions in the 2025 Proxy Statement.

152. Plaintiff, on behalf of First Solar, has no adequate remedy at law.

**SECOND CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duties**

153. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

154. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of First Solar's business and affairs.

155. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

156. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of First Solar.

157. In breach of their fiduciary duties owed to First Solar, the Individual Defendants willfully or recklessly caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the impact the newly imposed tariffs would have on the Company was understated; and (2) the Company's mitigation efforts in

response to the tariffs, such as opening a U.S. facility and underutilizing its facilities in Vietnam and Malaysia, were overstated. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

158. The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

159. Also in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate system of oversight, disclosure controls and procedures, and internal controls. Moreover, while the Company's stock price was artificially inflated as the result of the false and misleading statements alleged herein, Defendants Stebbins and Sweeney engaged in lucrative insider sales, netting proceeds of approximately $3.1 million.

160. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

161. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate

action to correct the scheme alleged herein and to prevent it from continuing to occur.

162.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

163.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, First Solar has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

164.   Plaintiff, on behalf of First Solar, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Unjust Enrichment

165.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

166.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, First Solar.

167.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from First Solar that was tied to the performance or artificially inflated valuation of First Solar or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

168.   Plaintiff, as a shareholder and a representative of First Solar, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

169.   Plaintiff, on behalf of First Solar, has no adequate remedy at law.

58

## FOURTH CLAIM
### Against the Individual Defendants for Abuse of Control

170. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

171. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence First Solar, for which they are legally responsible.

172. As a direct and proximate result of the Individual Defendants' abuse of control, First Solar has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

173. Plaintiff, on behalf of First Solar, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

174. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

175. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of First Solar in a manner consistent with the operations of a publicly held corporation.

176. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, First Solar has sustained and will continue to sustain significant damages.

177. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

178. Plaintiff, on behalf of First Solar, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

179.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

180.     The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

181.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused First Solar to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

182.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

183.     Plaintiff, on behalf of First Solar, has no adequate remedy at law.

## SEVENTH CLAIM
### Against Defendants Widmar and Bradley for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

184.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

185.     First Solar, Defendant Widmar, and Defendant Bradley are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Widmar's and Bradley's willful and/or reckless violations of their obligations as officers and/or

directors of First Solar.

186.    Defendants Widmar and Bradley, because of their positions of control and authority as officers and/or directors of First Solar, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of First Solar, including the wrongful acts complained of herein and in the Securities Class Action.

187.    Accordingly, Defendants Widmar and Bradley are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

188.    As such, First Solar is entitled to receive all appropriate contribution or indemnification from Defendants Widmar and Bradley.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of First Solar, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to First Solar;

(c)    Determining and awarding to First Solar the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing First Solar and the Individual Defendants to take all necessary actions to reform and improve First Solar's corporate governance and internal procedures to comply with applicable laws and to protect First Solar and its shareholders from a repeat of the

61

damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of First Solar to nominate at least five candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding First Solar restitution from the Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: July 28, 2026                              Respectfully Submitted,

                                        **THE BROWN LAW FIRM, P.C.**


                                        /s/ *Timothy Brown*
                                        Timothy Brown
                                        Elizabeth Donohoe

Case 1:26-cv-04555   Document 1   Filed 07/28/26   Page 63 of 64 PageID #: 63

1350 Avenue of the Americas, Suite 1200
New York, NY 10019
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
Email: edonohoe@thebrownlawfirm.net

## **VERIFICATION**

I, Manh Ho, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 9thM day of July 2026.
H

Signed by:

Manh Ho

3ED253794508459...

Manh Ho